# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUSAN CHUNG | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No.: N18C-12-236 SKR |
| SANG SOO LEE AND JUNG SOOK | ) | |
| LEE, | ) | |
| Defendants. | ) | |
| | ) | |

## <u>DECISION AFTER TRIAL</u>

Albert H. Manwaring, IV, Esquire, Philip M. Casale, Esquire, Kirsten A. Zeberkiewicz, Esquire, Barnaby Grzaslewicz, Esquire, Morris James LLP, Attorneys for Plaintiff.

Douglas A. Shachtman, Esquire, The Shachtman Law Firm, Attorney for Defendants.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This is a breach of contract action in which Plaintiff Susan Chung ("Chung") seeks damages from Defendants Sang Soo Lee and Jung Sook Lee ("the Lees") for a series of loans made from 2001 to 2011. These loans were not conventional but rather originated from a unique system that is traditional in the Korean communities known as a Kye. A Kye is a cash-based lending system that enables individuals without traditional loan opportunities to gain access to funds that wouldn't normally be accessible. Kyes have a fixed number of members who all make a fixed monthly contribution for a set number of months; then each member collects a lump sum distribution of the contributions plus interest for a designated month. Kye members can also make one-to-one personal loans which may or may not involve contributions or distributions. Members may also act as intermediaries, who facilitate and guarantee loans between lenders and lendees inside or outside of the Kye.

Chung and the Lees met in 1995.[1] They were part of the same neighborhood community in Wilmington, Delaware. Chung's dry-cleaning business and the Lees' grocery store, EZ Market, were on the same block.[2] At one point, the Lees moved one block away from Chung. Mrs. Lee and Chung described their relationship as "close friends" or "sisters."[3] After moving closer to Chung, Mrs. Lee joined two Kyes led by Chung.[4]

---

[1] Trial Tr. July 27, 2021, 17:15-17.
[2] *Id.*
[3] *Id.,* 23:21-23; Trial Tr. July 28, 2021, 105:13-14.
[4] One Kye provided a mid-month distribution, and the other was at the end of the month. Trial Tr. July 28, 2021, 107:7-14.

Chung orchestrated several Kyes in her community to enable fellow Korean immigrants to access funds and start their own businesses.[5] The Kyes in question, where Chung was organizer and Mrs. Lee was a member, included 21 members in total.[6] Each member made a fixed contribution of $1,500 each month for 21 months.[7] Each month, one member of the Kye collected $30,000, which represented a single lump sum distribution of the total monthly contributions, in addition to the accumulated interest for that month.[8]

From 2001 to 2011, Chung alleges that she personally made approximately 20 loans from the Kye network to the Lees.[9] Over this period of time, she alleges that she loaned $350,000 to the Lees, of which the Lees repaid $210,000.[10] Chung claims that the last principal payment received in connection with the outstanding debt was on November 1, 2010,[11] and the last interest payment was received in 2016.[12] As a result, Chung confronted the Lees in 2018 about the outstanding loans and subsequently filed a lawsuit.[13]

On December 21, 2018, Chung sued the Lees for the outstanding loans, alleging that she was owed $140,000 plus unpaid interest accruing at 12% per annum from March 2016 to the present, plus attorneys' fees, costs and other expenses.[14] On January 31, 2019, the Lees filed an Answer and Amended

---

[5] Trial Tr. July 27, 2021: 22:5-9.
[6] *Id.*, 18:19-19:5, 22:5-9.
[7] *Id.*, 21:2-6.
[8] Each Kye distribution came with an additional $80 of interest per $10,000. *E.g., Id.*, 19:20-20:4.
[9] For some of these loans, Chung personally loaned the money. For other loans, she served as an intermediary, soliciting funds from other Kye members to provide to Mrs. Lee as a loan. *Id.*, 23:1-24:17.
[10] Plaintiff's Trial Exhibit 3.
[11] Trial Tr. July 27, 2021, 55:3-6.
[12] *Id.*, 54:10-16.
[13] *Id.*, 68:1-3.
[14] Complaint at 6.

Counterclaim, asserting that the relevant "dealings" did not involve Defendant Sang Soo Lee ("Mr. Lee"), and that Chung was acting intentionally and maliciously by including him in the lawsuit.[15]

## II.  THE TRIAL

The Court held a two-day bench trial from July 27-28, 2021. The case was deemed fully submitted for decision after the parties submitted their post-trial briefing.

During trial, the Court heard from and considered the testimony of the following witnesses:

| | |
|---|---|
| Susan Chung | Young Wha Suh |
| Suk Hyun Pak | Sang Soo Lee |
| Young Yim | Jung Sook Lee |
| Youn Choi | |

## III.  STANDARD OF REVIEW

The Court is the finder of fact in a bench trial.[16] The plaintiff must prove each element of a claim by a preponderance of the evidence, meaning that the Court shall find in favor of the party upon whose side "the greater weight of the evidence is

---

[15] Answer and Amended Counterclaim at 4. The Lees' original Answer and Counterclaim asserted that it was Jung Sook Lee ("Mrs. Lee") who was not involved in the dealings. Answer, ¶12, 15. On June 17, 2019, the Lees filed a Motion for Summary Judgment, in which they contended that the loans were not enforceable pursuant to Delaware law. They argued that Chung did not satisfy the lender licensing requirements of 5 *Del. C.* § 2202 and thus, the loans are illegal pursuant to 5 *Del. C.* § 2240(a). Chung contended that Title 5, Chapter 22 is not applicable to her conduct. On September 3, 2019, the Court denied the Motion for Summary Judgment. The Court held that the record was not sufficiently complete to support a resolution by summary judgment. The ruling was made prior to the completion of discovery.

[16] *Pencader Associates, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del.Super. June 30, 2010).

found."[17] Since the Court is the finder of fact, it is up to the Court to weigh the credibility of witnesses and resolve conflicts in witness testimony.[18]

## IV.   ANALYSIS

### A. Assessment of the Parties' Conduct.

The litigation of this case has been riddled with evidentiary incongruities, mistranslations, miscommunication, and confusion from both sides, paving the way for a number of ancillary claims. Both parties accuse the other of bad faith and seek attorneys' fees as damages. Each party also seeks an adverse inference that missing documents from the other party would have proven to be unfavorable to their case. The Court will grant wide latitude in judging the parties' conduct, due to the unique circumstances of this case. The parties' dispute stems from an unusual and rather informal financial lending structure based on trust and credibility, which serves to bolster Delaware Korean immigrants' access to capital. And the corresponding customs and English language barriers of the parties lead to a somewhat murky evidentiary record.

### i. Bad Faith Assertions by The Parties

At the outset, the Court will address and resolve the parties' assertions of bad faith against each other. In her assertion of bad faith, Chung points to the Lees' shifting statements regarding receipts of personal loans, sources of repayment, receipts of Kye distributions, and a failure to produce records relating to payments to Chung.[19] The Lees allege bad faith against Chung, claiming that (1) Chung

---

[17] *Id.* (quoting *Pouls v. Windmill Estates, LLC,* 2010 WL 2348648, at *4 (Del.Super. June 10, 2010)).

[18] *Id.* at *3.

[19] Chung specifically alleges that in Mrs. Lee's responses to interrogatories, she claims that she did not receive any loans from Chung, then at trial, admits that she did. Plaintiff's Trial Exhibit 23, Trial Tr. July 28, 2021, 121:4-7. Chung asserts that Mrs. Lee's recounting of repaid Kye

falsified Korean to English translations of her bookkeeping to include Mr. Lee when the true translation did not include him, (2) misquoted Mr. Lee's statements, and (3) misstated that Chung's accounting ledger was something she documented at the time of the transactions when in reality, it was documented for the purposes of trial.[20]

Delaware recognizes that there is no single standard of bad faith that warrants an award of attorneys' fees.[21] Specific examples do include unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims.[22] However, the party seeking a fee award bears the stringent evidentiary burden of producing "clear evidence" of bad-faith conduct.[23]

The Court does not find that the parties' actions in this litigation are due to bad faith. Instead, the Court will consider the parties' inconsistencies in weighing the reliability of evidence. None of the parties – Mr. Lee, Mrs. Lee, and Mrs. Chung -- speak fluent English, and each used translators while testifying at trial. All three individuals were inconsistent both in pre-trial statements[24] and trial

---

distributions and sources of repayment are inconsistent. Plaintiff's Post-Trial Br. at 18-21. Chung further asserts that Mrs. Lee produced no records in connection to the personal loans, yet Mrs. Lee claimed that she kept records of the amounts repaid to Mrs. Chung, but not the amounts that she owed. Trial Tr. July 28, 2021, 124:22-125:1; 126:12-127:3.

[20] The Lees specifically allege that Chung falsely translated her bookkeeping to state that loans were to "Michelle's household" when the official translations stated that the loans were to "Michelle's mom." Amended Complaint, Plaintiff's Exhibit 2. Michelle is the daughter of Mr. and Mrs. Lee. In Korean culture, apparently it is "[customary] to refer to a mother by her eldest daughter's first name[.]" Trial Tr. July 28, 2021, 104:17-22. The Lees allege that Chung misquoted Mr. Lee in her opening brief, by stating that Mr. Lee admitted that he borrowed money from Chung. Defendant's Post-Trial Reply Br. at 22-24. The Lees allege that Chung claimed in her Complaint that Exhibit A was a contemporaneous ledger, when in reality it was not. Complaint, Plaintiff's Trial Exhibit 3.

[21] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005).

[22] *Id.*

[23] *Id.*

[24] The Lees had shifting statements about a number of debt-related issues, Chung misquoted Mr. Lee's statements, and Chung incorrectly stated when she completed her accounting ledger. As to

6

testimony.[25] While these inconsistencies have led to a lack of trust between the parties, they do not support "clear evidence" of bad faith conduct under the circumstances. Thus, the Court will not attribute bad faith to either party's conduct, and will not shift attorneys' fees.[26]

### ii. Adverse Inference Requests

In addition to language barriers, the informal nature of the Kye lending structure has led to some confusion and gaps in evidence. Both parties request an adverse inference ruling in regards to missing or withheld evidence. Chung asserts that she is entitled to an inference "that the evidence withheld by the Defendants regarding payments made to Mrs. Chung" supports the notion that her contemporaneous notes are accurate.[27] Conversely, the Lees assert that Chung's alleged destruction of previous Kye records is relevant and material to the dispute, and supports an adverse inference that they did pay off the balance.

---

the inclusion of Mr. Lee in Chung's bookkeeping in a pretrial exhibit, Chung concedes that this was an unofficial translation of the document and does not seek to have it admitted into evidence; instead, Chung asks the Court to rely on the official translations of the bookkeeping which do not include Mr. Lee. Plaintiff's Trial Exhibit 2.

[25] For example, Mrs. Lee was confused about the meaning of the word "payout" and whether it meant that she was receiving money or whether it was being applied to her Kye distributions. Trial Tr. July 28, 2021, 137:1-18. Mr. Lee contradicted himself about whether he was aware that Chung loaned his wife money. He testified, "I'm not aware of whether [Mrs. Lee] borrowed the money or not. I am not aware of that at all." *Id.*, 96:1-2. Then later, he testified that he was aware and thought that the question was about whether he was included in the loans. Mrs. Chung testified that the Lees signed a contract for the loans, then shortly thereafter stated, "we only did it verbally." Trial Tr. July 27, 2021, 24:22-23. When Defense Counsel questioned Chung about whether the accounting ledger was made in preparation of litigation or not, Chung became confused and struggled to answer the question. *Id.*, 75:1 – 79:3. At one point, Chung directed the cross-examiner to "please talk to my lawyer" because she could not answer the question.

[26] *Maurer v. Int'l Re-Insurance Co.*, 95 A.2d 827, 830 (Del. 1953) ("We start with the general principle that, apart from statute or contract, a litigant must pay his counsel fees.")

[27] Plaintiff's Post-Trial Br. at 31.

Before finding spoliation, a trial court must determine that a party acted willfully or recklessly in failing to preserve evidence.[28] The Court does not find that to be the case for either party. The Lees did not destroy evidence; they simply do not possess evidence.[29] Meanwhile, Chung's decision to destroy records was not related to the Lees or this trial.[30] The Court is also persuaded by the fact that Mrs. Lee acknowledged that she was aware that there is a dearth of documents that support the transactions.[31] Thus, the Court finds no evidence of either party acting intentionally or recklessly to destroy evidence. For that reason, the Court will not grant an adverse inference ruling against either party.

While the Court will not hold the parties' informalities against them in these ancillary claims, it will ascribe due weight to the inconsistencies in the record to determine whether Chung has met her burden of establishing her breach of contract claim by a preponderance of evidence. This case boils down to accounting and credibility. The Court must determine (1) if Chung's loans to Mrs. Lee created a legally enforceable contract, (2) if there was a breach, and (3) the proper calculation of damages.

---

[28] *Seats, Roebucks and Co v. Midcap*, 893 A.2d 542, 548 (Del. 2006).

[29] Mrs. Lee testified that she kept track of what was owed through her memory and did not keep any contemporaneous documents at the time of the debts. Trial Tr. July 28, 2021, 121:4-22.

[30] Chung testified that she would delete records of previous Kyes at the conclusion of their 21-month term. She would "keep it for some time, and then if it seemed to be unnecessary," she would delete it. Trial Tr. July 27, 2021, 22:21-23:6. In addition, Chung testified that even if she did not have Kye records, she would still document whether payments went towards repayment of personal loans. She claimed that she would notate that Mrs. Lee paid off some of the loans with the money that was received from the Kye. *Id.*, 97:7-10.

[31] During trial, Defense Counsel asked Mrs. Lee if she had the records of the Kyes in which she participated and made contributions. He inquired, "Would that have helped you in preparing to defend this lawsuit?" Mrs. Lee responded: "Actually we trust each other, so if she instead of a written record if we just say well, after I receive that distribution amount and then forward if she just credit toward the debt money owed. And so transaction records were just orally. We just knew each other [sic]." Trial Tr. July 28, 2021, 117:17-118:2.

8

## B. The Parties Had a Legally Enforceable Contract.

The parties do not contest whether Chung loaned Mrs. Lee money. Mrs. Lee conceded this at trial. When asked specifically if she received personal loans from Mrs. Chung, Mrs. Lee answered, "Yes."[32] In addition, Chung testified that she made personal loans to the Lees "rough [sic] speaking over 20 times."[33] She provided documentation of the personal loan amounts, which were noted on old calendars.[34] When asked how the loans were made, Chung testified, "[W]e only did it verbally. Then each time I would remind her how much the remaining balance was and then Mrs. Lee used to [sic] agree to the amount."[35]

The Court must resolve whether these oral arrangements for loans, as part of a Kye financial lending system, create a legally enforceable contract between the parties.[36] The burden is on the Plaintiff to prove by a preponderance of evidence the existence of a contract to which Defendant is a party.[37] The three elements necessary to prove the existence of an enforceable contract are (1) the intent of the parties to be bound by agreement, (2) sufficiently definite terms, and (3) consideration.[38] To prove the existence of an oral contract, Plaintiff must prove that the contract was clear and precise.[39]

---

[32] *Id.*, 120:23 – 121:2.
[33] Trial Tr. July 27, 2021, 23:15- 24:17.
[34] Plaintiff's Post-Trial Br. at 22, Trial Tr. July 27, 2021, 25:3-5, Plaintiff's Trial Exhibit 2.
[35] Trial Tr. July 27, 2021, 24:22-25:2.
[36] The Lees previously raised this issue at summary judgment, claiming that Chung's conduct falls squarely within the business of lending money, and thus must satisfy the lender licensing requirements of 5 *Del. C.* §2202. At the time, the Court ruled that it was premature to decide this issue because discovery was still ongoing. Subsequently, neither party raised this issue at trial or in post-trial briefings. Thus, the issue is not before the Court for a legal determination.
[37] *Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006).
[38] *Id.*
[39] *Id.*

Pursuant to Delaware law, an intention to be bound by an agreement may be evidenced by continued performance in accordance with an agreement's terms.[40] The test is whether a reasonable person would, based on the objective manifestation of assent, and all of the surrounding circumstances, conclude that the parties intended to be bound by contract.[41] Circumstances that the Court may consider are: "the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations."[42]

The Court finds a clear manifestation of assent by Mrs. Lee in her continued performance with Chung. Mrs. Lee started participating in Kyes with Chung around 2001, and received her last loan from Chung around 2011. She acknowledges that she participated in approximately nine Kyes with Chung.[43] She was also aware of the sufficiently definite terms of the Kye system and loan structure, including the number of members of the Kye, the monthly contribution of $1,500, and the distribution, of $30,000 per month. And she chose to continue participating for a number of years.[44] She repeatedly made her contributions to Chung and received her distributions at designated times. She received loans from Chung and made interest payments. Chung kept her apprised of how much she owed.

Further, the Court finds that Mrs. Lee intended to be bound by this Kye lending system, even without a concrete system of bookkeeping. Suk Hyun Pak, a

---

[40] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *4 (Del. Ch. Feb. 3, 2009).
[41] *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch.1986).
[42] *Id.* at 1102.
[43] Trial Tr. July 28, 2021, 109:19-21.
[44] *Id.*, 106:19-107:8.

longtime Kye participant, testified that it was customary that there would be no "contract or receipt in paper form" for the loans.[45] Mr. Yim, another Kye participant who loaned money on behalf of Mrs. Lee, testified, "We go by the word."[46] Mrs. Lee herself testified that "transaction records were just orally [sic]. We just knew each other."[47] The Court finds that Chung and Mrs. Lee had a valid oral contract for the loans made by Chung and repayment of money by Mrs. Lee, primarily based on the admitted existence of these personal loans.

### C. Chung Acted as Guarantor of the Loans.

The Lees further challenge Chung's right to enforce the repayment of the loans. They assert that it is unclear whether the money in question is owed to Chung, or alternatively, if Chung acted as a guarantor for the loans from others. As the Lees acknowledge, Kye members at times act as intermediaries, facilitating and guaranteeing loans between lenders inside or outside of the Kye with whom they have a relationship of trust.[48] The Lees claim that "there was an unknown factor of whose [sic] money Mrs. Lee was receiving and who was entitled to bring a claim for it."[49] They argue that initially Chung stated that she made cash disbursements to the Lees, but now claims that she is an intermediary who guaranteed the personal loans for members of her Kyes.[50]

The Court recognizes that the Kye acts as a revolving door in which members are constantly engaging as both creditors and debtors. Pak testified that she loaned Chung $100,000 to give to "those who need money", of which Chung

---

[45] *Id.*, 69: 1-5.
[46] *Id.*, 33: 8-9.
[47] *Id.*, 118:1-2.
[48] Defendant's Post-Trial Reply Br. at 4.
[49] *Id.* at 3.
[50] *Id.*

was then personally responsible to ensure that the loans were repaid with interest.[51] Pak further testified that Chung ultimately repaid the entire balance.[52] Yim loaned Chung $40,000 to give to Mrs. Lee. Chung also repaid Yim the entire balance.[53] Plaintiff asserts that if the Lees don't pay her back, then Chung is the one "left holding the proverbial bag."[54]

It is clear from the record that Chung served as guarantor for several of the loans at issue, and because she repaid the loans on behalf of Mrs. Lee, Chung now stands in the shoes of the individuals that provided the loans.

### D. Mrs. Lee Breached the Contract.

While the parties agree that Chung made loans to Mrs. Lee, they disagree as to whether money is still owed. Chung alleges that Mrs. Lee still owes her $140,000. Lee claims that she has repaid the entire balance.

The party seeking enforcement of a contract bears the burden to prove breach of the contract by a preponderance of evidence.[55] Chung argues that the trial record demonstrates that between 2001 and 2011, she loaned the Lees $350,000, and that the Lees repaid $210,000, resulting in a $140,000 principal balance.[56] Chung testified: "This didn't happen over one transaction. Sometimes I issued [a] loan to Mrs. Lee after borrowing that money from someone else and then in [certain] situation[s] . . . we had to repay that amount to the person who loaned the money, [because] Mrs. Lee could not pay back at that time [sic]."[57]

---

[51] Trial Tr. July 28, 2021, 80:8-81:11.
[52] *Id.*, 78: 8-20.
[53] *Id.*, 31:8-10.
[54] Plaintiff's Post-Trial Reply Br. at 1.
[55] *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013).
[56] Plaintiff's Trial Exhibit 3.
[57] Trial Tr. July 27, 2021, 50:2-6.

To support this claim, Chung offered two central forms of evidence: contemporaneous bookkeeping documenting the loans, and witness testimony. Chung also offers two specific examples of loans to the Lees to bolster the accuracy of accounting: the transaction for City Grocery and four checks issued by Ms. Choi.

Mrs. Lee contends that she repaid Chung through her Kye distributions and in cash.[58] Lee testified that her $30,000 distributions were applied to loans that she had with Chung. She however claims that she never received any documentation of the amount she borrowed and how much she repaid in any given month.[59] Lee states that she kept no records of the money that she repaid, but instead relied upon her memory.[60] She could not remember how many loans she received nor whether she was provided any accounting for the loans.[61] She claimed that she made a mental recording of the loans once Chung sued.[62] She stated that while she did not specifically remember how much she received, she did remember how much she repaid Chung.[63]

In order to determine if Chung has satisfied her burden by a preponderance of evidence that Mrs. Lee still owes her $140,000, or whether Mrs. Lee has successfully demonstrated that she paid off the loans with her Kye distributions, the Court will carefully review the record evidence and assess the parties' credibility.

---

[58] Trial Tr. July 28, 2021, 127:6-128:20.
[59] *Id.*, 109:5- 110:1.
[60] *Id.*, 121:13-18.
[61] *Id.*, 121:4-11.
[62] *Id.*, 121:16-18.
[63] *Id.*,, 125:19-21.

### i. Chung's bookkeeping

Chung, as leader of the Kyes, was responsible for keeping track of the distributions and personal loans made by members. Chung recorded her personal loans with Mrs. Lee starting in January 2001.[64] She alleges that she loaned money before this date, but 2001 was when she first started recording the debts.[65] She testified that she started recording "not because I didn't trust Mrs. Lee; however, I wanted to keep a record so I could remember things."[66] Chung asserts that she kept contemporaneous and chronological records of the loans with the Lees in two forms: old calendars used for Kye member loans[67] and a list that noted Kye distributions and loans to the Lees whenever she loaned them money.[68] Chung testified that she made these notes "each day" that she received money from or paid money to the Lees.[69] They were recorded in Korean, but were later translated to English by a translation service for purposes of trial. They were transferred into an organizing ledger for the same purpose.[70]

The Lees challenge Chung's accounting on two fronts: 1) Chung's improper bookkeeping methods and 2) the discrepancies in the accounting.[71]

---

[64] *Id.*, 84:17-20.

[65] The money sought for the purposes of this trial starts with the recorded loans in 2001. Trial Tr. July 27, 2021, 86:23-87:3.

[66] *Id.*, 83:13-15.

[67] Plaintiff's Trial Exhibit 3.

[68] Plaintiff's Trial Exhibit 4.

[69] Trial Tr. July 27, 2021, 26:6-12.

[70] Plaintiff's Trial Exhibit 2, Chung151 – TransPerfect certified that these were translated to English on December 3, 2020.

[71] The Lees also challenge Chung's memory. They argue that Chung has memory issues based on a number of inconsistent statements she made and thus, her bookkeeping should not be trusted. However, as previously addressed, the Court will grant wide latitude in what it views as English language and translation issues.

As to Chung's bookkeeping methods, the Lees argue that recording the debts in old calendars includes "none of the indicia of reliability that sometimes occur when people memorialize an event."[72] The Lees state that these records were made "on random pages" of the calendars from different years. The Lees question the veracity of the records because "the entries do not relate back to prior entries."[73] They also argue that Chung's credibility should be questioned because she only started recording Mrs. Lee's debts in 2001, even though there were loans before this date.

The Court finds little merit in these arguments. A close review of the calendars demonstrates that there is sufficient information to indicate how much was borrowed and how much was owed. Chung testified that she made her notes in old calendars, even though they did not correspond to the proper year, because she did not want to waste the calendar paper.[74] Although it is unconventional to make calendar entries under the wrong date, the dates printed on the top of recycled calendar pages are irrelevant. More importantly, the calendar records contain all of the relevant information: the dates of the transaction, the amount of money that was owed or paid back, from who, to whom, and other pertinent details such as a sum of money coming from a Kye distribution or given towards the transaction for City Grocery.[75] The validity of these debts should not be diminished because of the stationary on which it was recorded or the form in which it was recorded. Further, even though Chung did not start to document the Mrs. Lee's loans until 2001, there is no dispute about loans made prior to that time. Moreover, it bears repeating that

---

[72] Defendant's Post-Trial Reply Br. at 8.
[73] *Id.*
[74] Trial Tr. July 27, 2021, 26:13-17.
[75] In March of 2006, Mrs. Lee purchased a grocery store called City Grocery for $200,000. *See infra* p. 18.

the custom and structure of the Kye system lends itself to this type of informal recordkeeping.[76]

Next, the Lees contend that discrepancies in Chung's accounting diminishes her credibility. The Lees' main issues with the accounting are directed towards the secondary documents prepared for trial which were not admitted into evidence. The Lees point to Trial Exhibit M, an entry in Chung's calendar, that was translated into English. It shows a $10,000 loan on November 15, 2003, that is not recorded in Chung's ledger.[77] Similarly, this entry shows a $5,000 loan on October 20, 2005, but there is no corresponding entry recorded in the ledger.[78] The Lees argue that this demonstrates a lack of reliability in Chung's records. Chung explains that these versions of the calendar were incorrectly translated as they were being prepared in anticipation of litigation. They differ from the final corrected version of the translated calendar, which was certified by TransPerfect and admitted into evidence at trial. The Lees' argument is unavailing. An improperly translated version of Chung's calendar entries, which was not admitted into evidence at trial, will not be considered by the Court in its decision, and consequently has no bearing in this litigation.

Further, the Lees point out that a list created by one of Chung's attorneys in preparation of trial contains a $30,000 repayment entry for "end of July", but there is no corresponding entry shown in the ledger.[79] The Court finds the "end of July" entry on the attorney list to be an inadvertent reference to the August 30, 2007

---

[76] Indeed, Chung stated concerning the retention of records in the Kye system, "the money was collected and distributed. It was concluded." Trial Tr. July 27, 2021, 83:11-13. Chung testified that she did not keep records of personal loans with other Kye members because everything "cleared with them." *Id.*, 83:14-17.

[77] Defendant's Trial Exhibit M. Plaintiff's Trial Exhibit 3.

[78] Defendant's Trial Exhibit M, Chung43.

[79] Plaintiff's Trial Exhibit 12, Chung055.

repayment entry listed in the ledger. Indeed, the description in the attorney's list notes "from final week of August Kye."[80]

There are also typographical errors in the ledger. The Lees point out a disparity in a January 15, 2005 entry in the calendar which was entered as January 15, 2006 in the ledger. They also note that in one calendar, there is a recording for May 31, and in the ledger, it is entered as May 13. These disparities are typographical errors rather than issues of substance, and they do not impact the calculation of the outstanding balance.[81]

### ii. Witness Testimony

Chung also offered witness testimony to corroborate and confirm some of the loans made to the Lees. Suk Hyun Pak and Young Yim testified that Chung served as an intermediary to borrow money from each of them and subsequently loan it to the Lees. Pak loaned a total of $100,000 to Chung to give to Mrs. Lee. [82] Yim loaned $40,000 to Chung to give to Mrs. Lee. [83] Pak testified that she knew she was ultimately loaning this money for the benefit of Mrs. Lee, and even met with Mrs. Lee to tell her this.[84] Yim also testified at trial that he knew he was loaning money to Chung to in turn give to Mrs. Lee.[85] He recalls giving $20,000 to Chung on two separate occasions for a total of $40,000.[86]

---

[80] *Id.*

[81] The Lees raise two additional discrepancies between the calendar notes and the ledger. On November 15, 2003, there is a $10,000 loan to the Lees in the calendar but not in the final ledger. On October 20, 2005, there is a $5,000 loan to the Lees in the calendar but not in the final ledger. Chung did not include those amounts in her calculation of the outstanding loans against the Lees. Thus, the Court will not include those amounts in its calculation of damages.

[82] Trial Tr. July 27, 2021, 50: 9-11.

[83] *Id.*, 50: 19 – 51:3.

[84] Trial Tr. July 28, 2021, 74:13-75:20.

[85] *Id.*, 30:11-16.

[86] *Id.*, 30:17-23.

### iii. City Grocery transaction

Chung cites the purchase of City Grocery as additional evidence of the accumulation of the running list of loans made to the Lees that were not repaid. In March of 2006, Young Wha Suh sold City Grocery to Mrs. Lee for $200,000.[87] The transaction took place at Chung's house.[88] Chung claims that she loaned $60,000 to the Lees to partially pay the down payment for the grocery store for the Lees.[89] Suh testified that he remembers Mrs. Lee paying him $60,000 that day in cash.[90] Chung asserts that she was responsible for that amount if the Lees failed to pay her back.[91] Chung testified that the Lees paid another $60,000 through two of Mrs. Lee's Kye distributions.[92] The records do not indicate that there was an exchange of cash but presumably an arrangement to pay Suh through Mrs. Lee's Kye distributions. Suh testified that he recalled receiving these Kye payments later that year.[93] The remaining $80,000 was accounted for and repaid by the Lees selling the EZ Market, a smaller grocery store that they had previously owned and operated.[94]

Mrs. Lee contends that she satisfied her obligation in full for the City Market loan through Kye distributions. She alleges that Chung covered the balance of the purchase of the City Grocery store for $120,000.[95] Mrs. Lee testified, "[m]y only involvement was paying my balance through the [Kye] system to Mrs. Chung."

---

[87] Trial Tr. July 27, 2021: 39: 8-12, Trial Tr. July 28, 2021, 55:1-5.
[88] Trial Tr. July 28, 2021, 55: 6-17.
[89] Trial Tr. July 27, 2021, 39:17-21.
[90] Trial Tr. July 28, 2021, 56:8-16.
[91] Trial Tr. July 27, 2021, 40:2-5.
[92] *Id.*, 40:6-11.
[93] Trial Tr. July 28, 2021, 57: 1-7.
[94] *Id.*, 57:11-21, 111:6-22.
[95] This testimony conflicts with Chung's testimony that $60,000 of the payment was paid directly to Suh via Kye distributions and Suh's testimony that he received payment via Kye distributions later that year.

18

She alleges that she paid two Kye distributions to Mrs. Chung in 2006: one $30,000 payment in May and one $30,000 payment in June. She alleges that she also paid two later Kye distributions to Chung: one payment in June 2007 for $30,000 and the other payment of $30,000 in February 2008. Lee alleges that by this time, "the total remaining balance of $120,000 was paid off for the purchase of City Grocery."[96] Contrary to Mrs. Lee's testimony, Chung's records show that Mrs. Lee's May and June 2006 Kye distributions were applied towards paying Young Wha Suh, which Suh acknowledged receiving.[97] As for the later distributions, Chung's records show that Lee paid back $30,000 in July 2007, but nothing in February 2008.[98] Thus, there is still a $30,000 discrepancy in repayment of the City Market loan that Chung made to Mrs. Lee.

### iv. The Four Checks written to Mrs. Lee

Chung also points to four checks issued by a member of her Kye, Youn Choi, as further evidence of the Lees' debt obligation.[99] Ms. Choi owed Chung $40,000 which she repaid in the form of four checks.[100] Chung asked Choi to write the checks to Mrs. Lee who was waiting to obtain a loan. Choi testified, "I put Lee and then so I wrote all these checks to [sic] on behalf of Mrs. Chung for $40,000."[101] These checks were issued in 2009 through Wilmington Trust, and correspond with Choi's bank statement.[102]

---

[96] Plaintiff's Trial Exhibit 25.
[97] Plaintiff's Trial Exhibit 5.
[98] Plaintiff's Trial Exhibit 5.
[99] Plaintiff's Trial Exhibit 20 and 21.
[100] Trial Tr. July 28, 2021, 40:1-8.
[101] *Id.,* 41:1-3.
[102] Plaintiff's Trial Exhibits 20 and 21.

### v. Total Damages

The evidence in the record does not support the Lees' defense that they paid the outstanding loan balance in full. Mrs. Lee kept no records of repayments. She relies solely on her memory of loans made over a decade ago. Thus, the Court is left without any tangible evidence to support her claim.

On the other hand, even though Chung's records contain some gaps, they provide the only documentary evidence in the record of loans made to Mrs. Lee and payments credited against those loans. When cross reference is made between Chung's documentary evidence, the Court is satisfied that loans were made to Mrs. Lee over the period 2001 – 2011 and the repayments were properly credited leaving a balance of $133,520. The record evidence consists of calendars listing 23 loans made to the Lees, and a corresponding 11 entries of repayment by the Lees.[103] Chung's calendar entries are supplemented by witness testimony which affirms the issuance of loans for the benefit of the Lees, checks specifically made payable to the Lees, and a City Market transaction.

In addition to the record evidence presented by Chung and the absence of any records from the Lees to support the assertion that the loans were repaid in full, the Court also weighed the credibility of the parties. Chung has been a Kye leader for decades. As Mrs. Lee herself said of Chung: "She's famous to [sic] lending money, so a lot of people know about her."[104] Chung testified that she never had any financial discrepancies with other Kye members other than the Lees.[105] The Court gives significant weight to Chung's lending record as well as

---

[103] Plaintiff omits that Mrs. Lee repaid $3,480 from a $10,000 loan on March 30, 2004, and that Mrs. Lee repaid an additional $3,000 on November 1, 2010. Plaintiff's Trial Exhibit 2, Chung 135 & 149.
[104] Trial Tr. July 28, 2021, 107: 13-14.
[105] Trial Tr. July 27, 2021, 23: 7-14.

20

the other evidence produced at trial. And while the Court has no specific reason to doubt Mrs. Lee's truthfulness, her reliance on her memory is insufficient to overcome the documentary evidence in the record of specific disbursements and partial repayment of the loans. Therefore, based on the documentary evidence in the record, the Court finds that Mrs. Lee owes Chung a balance of $133,520 as principal remaining on the loans.[106]

The Court also finds that Mrs. Lee owes Mrs. Chung some interest in addition to the principal balance. The obligation to pay interest on loans made among Kye members is not clear or precise. Trial testimony was conflicting as to the requirement to pay interest; some Kye members paid interest while others deemed it unnecessary. Mrs. Pak testified "Most of the time, yes, you pay the interest, unless you are really, really [sic] close relationship and they do not charge interest."[107] Mr. Yim testified that he was content to receive his principal back from Chung with no interest.[108]

Moreover, the record is unclear as to which loans in the ledger were personally funded by Chung and which ones were facilitated by Chung from a third party, who may or may not have required interest. Chung asserts that Mrs. Lee owes $1,400 a month in interest for the $140,000 principal, but ignores the fact that Mr. Yim had already forgiven the interest on his $40,000 loan.[109]

The informality of the Kye system coupled with the lack of clarity in the record on interest obligations makes it difficult to calculate the correct amount of interest due in this case. In navigating this quagmire, the Court will require Mrs.

---

[106] The Court need not rule on Chung's claim for unjust enrichment because it has found Mrs. Lee liable for the $133,520 loan balance under a theory of contract.
[107] Trial Tr. July 28, 2021, 68:13-15.
[108] *Id.*, 34:2-10.
[109] *Id.*

21

Lee to pay only that amount of interest that has been proven by a preponderance of evidence. Here, the record is clear that Mrs. Lee paid interest to Chung at 1% of the outstanding loan balance per month. In fact, she was making interest-only payments of $1,400 per month from 2011 through approximately February of 2016.[110] Thereafter, she stopped making her interest payments.

Mrs. Pak testified that at that point, Chung made the $1,000 interest payment "out of her own pocket" for two months on the $100,000 principal loan.[111] Mrs. Pak then agreed to cut the interest payment in half requiring only $500 per month.[112] Chung and Mrs. Lee subsequently negotiated to allow Mrs. Lee to pay $300 of that interest amount per month with Chung paying the $200 difference to Mrs. Pak.[113] Notwithstanding this arrangement, Mrs. Lee stopped making her interest payments in December 2016. Ultimately, Chung repaid Mrs. Pak's loan.[114] Chung paid $20,000 to Mrs. Pak in 2018 and the remaining $80,000 in 2020.[115] There is no indication in the record that Chung paid any interest to Mrs. Pak in connection with loan repayments in 2018 and 2020, or any time after Mrs. Lee stopped paying in 2016.[116]

---

[110] Presumably, $1,000 of this amount went to Mrs. Pak as 1% of her $100,000 loan and $400 went to Yim as 1% interest on his $40,000 loan.

[111] Trial Tr. July 28, 2021, 77:19-78:4.

[112] *Id.*

[113] Trial Tr. July 27, 2021, 57:6-9. Chung also made a contemporaneous note of the agreement to pay $300 a month, which states "Has not paid interest since March 2016 . . . Gave $300 per month from May 2016 to December 2016 . . . Said that (she) would get mortgage and pay back in a few months[.]" Plaintiff's Trial Exhibits 13 and 14.

[114] Chung also repaid Mr. Yim. Chung paid $10,000 to Mr. Yim in 2016, then $10,000 in 2017, and the remaining $20,000 in 2020. Trial Tr. July 28, 2021, 6:9-12, 31:8-10. Chung did not pay any interest, and Yim said that he was not expecting it. He was simply happy that he was repaid his principal. *Id.*, 34: 8-10.

[115] Trial Tr. July 28, 2021, 5:16-22, 78:5-12.

[116] It is not clear whether Mrs. Pak forgave the remaining interest due post-2016 when Chung personally repaid the balance, similar to what Mr. Yim did on his $40,000 loan.

Further, there is no clear evidence in the record from which the Court can calculate how much of the outstanding loans comprised personal loans from Chung to Mrs. Lee as opposed to third parties, and how much was due as interest. Thus, the only clear evidence from which the Court can readily calculate interest due from Mrs. Lee and payable to Chung is Mrs. Pak's agreement to cut the interest in half. Pak reduced the interest payment to $500 per month as of May 2016.[117] Chung paid $200 to Mrs. Pak on behalf of Mrs. Lee from May to December 2016, at which point Mrs. Lee ceased all payments. The record is silent as to whether any further interest was paid to Mrs. Pak since that time or whether she forgave the remaining interest obligation. Accordingly, the record supports an award of interest to Chung from Mrs. Lee in the amount of $3,600.[118]

### E. Mr. Lee is Excluded from the Loan.

Chung filed this claim against both Mr. and Mrs. Lee, alleging that Mr. Lee is also a party to the loan agreements. Chung claims that (1) Mr. Lee was aware that these loans were for both he and his wife, [119] (2) custom dictates that Mr. Lee is a party to the deal,[120] (3) Mr. Lee was "involved" with the loans and (4) both Defendants benefitted from the loans, specifically through City Grocery.[121]

The Lees do not dispute that Mr. Lee was aware of the loans. Mr. Lee testified that he was aware of his wife's participation in the Kye, and he was aware that she had borrowed money; but he did not actually witness the transactions.[122]

---

[117] *See* Plaintiff's Trial Exhibits 13 & 14.
[118] The Court has determined that Mrs. Lee owes Chung for her two $1,000 interest payments, in March/April of 2016 plus the supplemental $200 interest payments that she made from May to December 2016 to Mrs. Pak.
[119] Plaintiff's Post-Trial Br. at 8-9.
[120] Trial Tr. July 27, 2021: 99:21 – 100:1.
[121] Trial Tr. July 28, 2021, 13:17-20.
[122] *Id.,* 97:4-15.

Mr. Lee testified that he was never part of any Kye, nor did he ever borrow money from Chung.[123] There is no evidence in the record other than Chung's word that Mr. Lee acknowledged the loans were for both he and his wife. Indeed, Chung's own records controvert this allegation. The notes and calendars on which Chung conducted her accounting only refer to "Michelle's Mom",[124] a reference to Mrs. Lee, rather than both spouses. There are no documents that implicate Mr. Lee in these loans.

Chung points to Mr. Lee's involvement in his wife's purchase of City Grocery as evidence that he is a party to the loan agreements. The Defendants agree that Mr. Lee was present at Chung's house the day of the City Grocery transaction. However, Mrs. Lee testified that her husband was only there for a "short period of time" then left.[125] Suh testified that Mr. Lee was "out in the living room" while he, Mrs. Lee, and Mrs. Suh executed the transaction in the kitchen.[126] Suh testified that Mr. Lee was not part of the discussions "with regard to selling City Grocery."[127]

Further, the documentary evidence demonstrates that Mr. Lee was not a party to the City Grocery transaction. Mrs. Lee's name is the only name on the contract to purchase City Grocery.[128] The Registration of Trade, Business & Fictitious Name Certificate, filed with the Delaware Superior Court Prothonotary, indicates that City Grocery is solely owned by Mrs. Lee.[129] The commercial lease

---

[123] *Id.,* 91:11-18.
[124] Michelle is Mrs. Lee's first-born daughter. *See fn* 21.
[125] Trial Tr. July 28, 2021, 110: 21-111:4.
[126] *Id.,* 55: 10-17.
[127] *Id.,* 61:8-17.
[128] *Id.,* 112:6-9.
[129] Defendant's Trial Exhibit E.

24

only lists Mrs. Lee's name.[130] The state net profits tax return only lists Mrs. Lee.[131] The bank account used for City Grocery only lists Mrs. Lee as an account holder.[132] Mr. Lee did not sign any agreement to be bound, nor did he sign to any secondary agreement around City Grocery which would obligate him to this debt.

The Court recognizes that Mr. Lee was involved in his wife's life, and naturally benefitted from these loans. Mr. Lee himself testified that he helped out in the operation of the store.[133] But he did not receive any income after Mrs. Lee purchased City Grocery. He received a stipend from his wife, and the two shared a bank account.[134] However, this is the nature of a marital relationship. It does not infer an agreement to be bound by a contract. There is no presumption of agency in marital relationships.[135]

Chung also suggests that it is customary for a husband to be included in this type of loan under the Kye system. She alleges that it is a part of Korean custom that even when a husband is involved, the wife physically receives the loan.[136] Suh testified that he believed the Lees "operated together" because they were husband and wife.[137] However, no testimony, expert or otherwise, was proffered to show other examples within a Kye of a husband being bound to a loan agreement made solely with his wife. While industry custom is a consideration in reviewing the existence and enforcement of contractual agreements, it is only one of many considerations. The weight of the record evidence tilts significantly in favor of

---

[130] Defendant's Trial Exhibit F.
[131] Defendant's Trial Exhibit G.
[132] Defendant's Trial Exhibit H.
[133] Trial Tr. July 28, 2021, 92:5-8.
[134] *Id.,* 100:23-102:17.
[135] *Wilson v. Pepper,* 1995 WL 562235 at *3 (Del. Super. Aug. 21, 1995), *aff'd,* 676 A.2d 909 (Del. 1996).
[136] Trial Tr. July 27, 2021: 99:21 – 100:1.
[137] Trial Tr. July 28, 2021, 56: 2-4.

extricating Mr. Lee as an obligor or beneficiary of the subject loans made to Mrs. Lee.[138] The record does not contain sufficient evidence to obligate Mr. Lee for the personal loan to purchase City Grocery or any of the other loans through the Kye system.

### F. The Statute of Limitations Does Not Bar The Claim.

The Lees argue that 10 *Del. C.* §8106(a) bars Chung's claim because this action was filed more than three years from the accrual of the cause of action. They contend that, based on Chung's assertion that no payments have been made on the principal since 2010, Chung was required to file her lawsuit in 2013. Because Chung filed suit on December 21, 2018, the Lees argue that the action is time barred.

Chung contends that the loans could be called at will, and that the default did not occur until there was a demand. Chung asserts that she did not make a demand for repayment until 2017 at which time she attempted to have the Lees sign promissory notes. She filed this lawsuit in December 2018 which she contends was well within the limitation period which ran from the point of demand.

---

[138] The Lees assert in their Counterclaim that Chung is aware that Mr. Lee was not a part of these dealings, and that she is "using the legal process of filing suit in this court against Sang Soo Lee for purposes not intended by law." Amended Counterclaim, ¶ 14. They allege that Chung is acting intentionally and maliciously. They seek to enter a judgment against her for the damage that will occur in defending this action. The Court finds the record is devoid of evidence of malice by Chung. For the Lees to prove a claim for malicious prosecution, they must prove "1) institution of civil proceedings; 2) without probable cause; 3) with malice; 4) the termination of the proceedings in the aggrieved party's favor; and 5) damages which were inflicted upon the aggrieved party." *Nevins v. Bryan*, 2005 WL 2249520, at *1 (Del. Super. Sept. 8, 2005), *aff'd*, A.2d 120 (Del. 2006). While the Court disagrees that Mr. Lee was a part of these dealings, Chung's inclusion of Lee in the lawsuit does not rise to the level of intentional and malicious conduct. Chung has posited reasonable, albeit unsuccessful, reasons for bringing Mr. Lee into the action. Thus, the Lees' malicious prosecution claim against Chung fails.

26

The Court agrees with Chung's summation of the applicable statute of limitations. The Lees erroneously conclude that the cause of action commenced when they stopped paying the principal. However, Chung is correct that there is no specified maturity date for these loans. Witness testimony demonstrates that there was no specific time frame by which the loans had to be repaid. Instead, the loans are payable on demand in the Kye system.[139] For a breach of contract claim, the cause of action accrues "at the time the contract is broken, not at the time when actual damage results or is ascertained."[140] For that reason, the Court finds that the statute of limitations does not bar this claim.

### G. Conclusion

For the reasons set forth above, the Court finds that Mrs. Lee owes the $133,520 principal balance and an additional $3,600 in interest to Mrs. Susan Chung, together with any post-judgment interest. **IT IS SO ORDERED,** this 31st day of March, 2022.

Sheldon K. Rennie, Judge

---

[139] *See* Trial Tr. July 28, 2021, 20:16-34:10, 51:15-64:16, 65:1-86:6 ("They were giving it to me like [sic] I don't know how long[.]") ("I'm not expecting it. If she give me[sic], good; but if it's not, it's not.")

[140] *Worrel v. Farmers Bank of Del.,* 430 A.2d 469, 472 (Del.1981).